IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


ROGER L. BUSH,

        Plaintiff,

v.                                      Civil Action No.1:04-CV-258

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
              Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

    Plaintiff, Roger L Bush, (Claimant), filed his Complaint on December 21, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on February 25, 2005.[2]

Claimant filed his Motion for Summary Judgment and Memorandum in Support on April 27, 2005.[3]

Commissioner filed her Motion for Summary Judgment and Brief in Support on May 26, 2005.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment and Brief in Support</u>.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 9.

[4] Docket Nos. 11 and 12.

2.     <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

C.     <u>Recommendation</u>

I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly evaluated the medical opinion of record; (2) was not required to recontact Claimant's treating physician; (3) properly rejected the functional assessment of psychological evaluators; (4) conducted a proper credibility analysis; and (5) accounted for all of Claimant's limitations in the hypothetical question posed to the vocational expert.

## II. Facts

A.     <u>Procedural History</u>

On December 25, 1998, Claimant filed for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) payments alleging disability since August 10, 1998. The application was denied initially and on reconsideration on January 27, 1999. Another application for DIB and SSI was filed on April 22, 1999, alleging a disability beginning August 10, 1998. This claim was denied at the initial level on June 2, 1999. On July 24, 2000, Claimant filed application for DIB and SSI alleging disability beginning August 10, 1998. The claims were denied initially and on reconsideration. A hearing was held on June 27, 2002 before an ALJ. The ALJ's decision, dated October 8, 2002, denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on October 22, 2004. This action was filed and proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 39 years old on the date of the June 22, 2002 hearing before the ALJ. Claimant has a high school equivalency diploma and past relevant work experience as a construction worker.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: August 10, 1998-October 8, 2002.

**Dr. David Proctor, 12/28/1998, Tr. 244**
Diagnosis: Insulin Dependent diabetes, peripheral neuropathy

**Dr. Anderson, 12/10/998, Tr. 249**
General Health: fair

**Residual Physical Functional capacity assessment, 1/22/1999, Tr. 258-265**
Exertional Limitations: none established.
Postural Limitations: none established.
Manipulative Limitations: none established.
Visual Limitations: none established.
Communicative Limitations: none established.
Environmental Limitations: none established.

**Stonewall Jackson Memorial Hospital, 7/5/2000, Tr. 266**
Final Diagnosis: 1. Diabetes mellitus, now better controlled.
                        2. Atypical chest pain.  Upper chest wall pain.

**Stonewall Jackson Memorial Hospital, 7/3/2000, Tr. 272**
Diagnosis/Plan: The patient was admitted with diagnosis of early diabetic ketoacidosis and atypical chest pain. He was started on insulin drip. He was admitted for further workup with cardiac enzymes.  He was hydrated.  Started on Nitroglycerin paste one inch every six hours. Cardiac enzymes every 8 hours x 3.  EKG in the morning.  Atypical chest pain.  The patient is a full code.

**Stonewall Jackson Memorial Hospital, 7/4/2000, Tr. 274**
ASSESSMENT:
1.      Diabetes mellitus.  Blood sugar has been much improved.  It is in control.
2.      Atypical chest pain, probably chest wall pain, resolved and no further chest pain.  His cardiac enzymes are negative.  We are awaiting his treadmill test.

**Stonewall Jackson Memorial Hospital, 7/5/2000, Tr. 276**

ASSESSMENT:
1.    Atypical chest pain.  Stress test was negative.  The patient had recurrent chest pain.  A
      stress test with Thallium will be needed.
2.    Diabetes mellitus.  The patient needs to have aggressive treatment for his diabetes
      mellitus or risk factors.

**Stonewall Jackson Memorial Hospital, Graded Exercise Tolerance Test,7/5/2000, Tr. 278**
Interpretation: Negative EKG exercise test.

**West Virginia Department of Health and Human Resources, 7/25/2000, Tr. 312**
Diagnosis:
      Major: Diabetes Mellitus and neuropathy; extensive tobacco usage; alcoholism.
      Minor: Hyperlipidemia, back pain

**West Virginia Department of Health and Human Resources, 7/25/2000, Tr. 314**
Diagnosis:
      major: diabetes mellitus
      minor: diabetic neuropathy

**West Virginia Department of Education and the Arts, Division of Rehabilitation Services, 8/31/2000, Tr. 319**
Diagnosis: diabetic neuropathy

**West Virginia Department of Education and the Arts, Division of Rehabilitation Services, 5/17/2000, Tr. 321**
Diagnosis: peripheral neuropathy, BN, VE

**Division of Rehabilitation Services, 1/7/1999, Tr. 322**
Diagnosis: severe peripheral neuropathy

**Physical Functional Capacity Assessment, 8/31/2000, Tr. 324-332**
EXERTIONAL LIMITATIONS
Occasionally lift and/or carry, 50 pounds;
Frequently lift and/or carry, 25 pounds;
Stand and/or walk, about 6 hours in an 8-hour workday;
Sit for a total of about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.

POSTURAL LIMITATIONS
Climbing, balancing, stooping, kneeling, crouching, crawling: frequently.

MANIPULATIVE LIMITATIONS
None established

VISUAL LIMITATIONS
None established

COMMUNICATIVE LIMITATIONS
None established

ENVIRONMENTAL LIMITATIONS
None established

**Physical Functional Capacity Assessment, 9/11/2001, Tr. 333-340**
EXERTIONAL LIMITATIONS
Occasionally lift and/or carry, 20 pounds;
Frequently lift and/or carry, 10 pounds;
Stand and/or walk, about 6 hours in an 8-hour workday;
Sit for a total of about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.

POSTURAL LIMITATIONS
Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally.

MANIPULATIVE LIMITATIONS
None established

VISUAL LIMITATIONS
None established

COMMUNICATIVE LIMITATIONS
None established

ENVIRONMENTAL LIMITATIONS
Extreme cold, vibration, hazards: avoid concentrated exposure.
Extreme hear, wetness, humidity, noise: unlimited.

**Dr. Melinda Lucky, 10/5/2000, Tr. 341-343**
OD: OJO Sphere 20/20
OS: OJO Sphere 20/20-3

**Gilmer Primary Care, 5/8/2001, Tr. 349**
Assessment:  1.  DM;
            2.  Neuropathy;
            3.  Retinopathy;
            4.  Nicotine abuse.

**Gilmer Primary Care, 4/3/2001, Tr. 354**

Assessment:    1.    Vision change;
               2.    Hemoptysis;
               3.    IDDM;
               4.    Nausea and lethargy.
               5.

**Gilmer Primary Care, 2/1/2001, Tr. 361**
Assessment:    1.    DM;
               2.    Diabetic neuropathy;
               3.    Weight loss.

**Gilmer Primary Care, 1/18/2001, Tr. 364**
Assessment:    1.    IDDM;
               4.    Anxiety.

**Gilmer Primary Care, 1/11/2001, Tr. 367**
Assessment:    1.    IDDM;
               2.    Diabetic neuropathy.

**Gilmer Primary Care, 1/2/2001, Tr. 370**
Assessment:    1.    IDDM;
               2.    Neuropathy.

**Gilmer Primary Care, 11/28/2000, Tr. 374**
Assessment:    1.    IDDM;
               2.    Neuropathy to the lower extremities.

**Gilmer Primary Care, 11/2/2000, Tr. 378**
Assessment:    1.    DM with evening hyperglycemia;
               2.    Neuropathy in the feet.

**Gilmer Primary Care, 10/28/2000, Tr. 380**
Assessment:    1.    DM;
               2.    Hypoglycemic episode.

**Gilmer Primary Care, 10/26/2000, Tr. 384**
Assessment:    1.    IDDM;
               2.    Diarrhea that has decreased in frequency and amount.

**Gilmer Primary Care, 10/16/2000, Tr. 390**
Assessment:    1.    DM;
               2.    Peripheral neuropathy;
               3.    Diarrhea.

**Gilmer Primary Care, 10/12/2000, Tr. 393**

Assessment:  1.  DM partially uncontrolled at this time;
             2.  Abdominal cramps.

**Gilmer Primary Care, 9/26/2000, Tr. 395**
Assessment:  1.  DM;
             2.  Gastric upset w/diarrhea, secondary to his medication;
             3.  Insomnia.

**Gilmer Primary Care, 9/19/2000, Tr. 398**
Assessment:  1.  DM w/peripheral neuropathy;
             2.  Abd pain? PUD vs. pancreatitis due to Hx of alcoholism;
             3.  Tachycardia.

**Gilmer Primary Care, 9/12/2000, Tr. 432**
Assessment:  1.  Gastroenteritis;
             2.  DM.

**Gilmer Primary Care, 8/1/2000, Tr. 408**
Assessment:  1.  DM, improving.

**Gilmer Primary Care, 7/15/2000, Tr. 413**
Assessment:  1.  DM w/poor control;
             2.  Hx of GERD.

**Gilmer Primary Care, 7/8/2000, Tr. 417-418**
Assessment:  1.  NIDDM w/poor control;
             2.  LT hydrocele;
             3.  Hyperlipidemia.

**Residual Functional Capacity Assessment, Mental, 4/6/2002, Tr. 422-428**
Impairments and symptoms alleged by claimant and consistent with clinical records and observations: insulin dependent diabetic; diabetic neuropathy/nerve pain in his lower extremities; decreased feeling and function in lower extremities; anxiety; sinus tachycardia; insomnia; anxiety.

Not capable of doing for an 8-hour day: walking/standing most of the time lifting 50 pounds frequently and up to 100 pounds occasionally; walking/ standing most of the time lifting 25 pounds frequently and up to 50 pound occasionally; a significant amount of walking/standing lifting 10 pounds frequently and up to 20 pounds occasionally; sitting most of the time and standing occasionally, lifting no more than 10 pounds.

Part-time sedentary, no walking or lifting.

Stand: 10 mins

Walk: 10 mins

Must alternate positions frequently

Climbing, balancing, stoop/bend, kneeling, crouching, crawling, stretching, reaching, squatting: never perform.

Machinery, jarring or vibrations, excessive humidity, cold or hot temperatures, fumes, dust, noise, environmental hazards: restricted.

## Cardinal Psychological Services, 4/4/2002 and 4/5/2002, Tr. 429-438
DIAGNOSTIC IMPRESSION:

| | |
|---|---|
| Axis I: | Major Depressive Disorder, without Psychotic Features, Moderate; |
| | Alcohol Dependence, in early remission; |
| | Nicotine Dependence; |
| | Pain Disorder, associated with a Medical Condition with Psychological Factors; |
| Axis II: | Borderline intellectual functioning, Traits of Cluster A Personality Disorder; |
| Axis III: | Reported back pain, diabetes mellitus type II, hyperlipidemia, and Erectile dysfunction; |
| Axis IV: | Financial Problems; |
| Axis V: | Current GAF of 55. |

## Mental residual Functional Capacity assessment, 4/4/ 2002, Tr. 439-442
UNDERSTAND AND MEMORY:
The ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; detailed instructions: not significantly limited.
SUSTAINED CONCENTRATION AND PERSISTENCE:
The ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions: not significantly limited.
The ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to work in coordination with or proximity to others without being distracted, to complete a normal work-day and workweek without interruptions: moderately limited.
SOCIAL INTERACTION:
Not significantly limited
ADAPTATION:
The ability to respond appropriately to changes in work setting, to travel in unfamiliar places: not significantly limited.
The ability to be aware of normal hazards and take appropriate precautions, to set realistic goals or make plans independently.

## Psychiatric Review Technique, 4/4/2002, 443-456
Affective Disorders:
Depressive syndrome characterized by: anhedonia or pervasive loss of interest in almost

all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feeling of guilt or worthlessness; difficulty concentrating or thinking.

Substance Addiction Disorders: Listing 11.14-Peripheral neuropathies

Functional Limitations:
      Restriction of Activities of Daily Living, Difficulties in Maintaining Social Functioning: moderate.

      Difficulties in Maintaining Concentration, persistence or pace: mild.

**Minnie Hamilton Health Care, 2/18/2002, Tr. 261**
Assessment:        1.      Left great toe wound

**Minnie Hamilton Health Care, 1/29/2002, Tr. 263**
Assessment:        1.      DM;
                      2.      Neuropathy.

**Minnie Hamilton Health Care, 1/19/2002, Tr. 264**
Assessment:        1.      MDDM;
                      2.      URI.

**Dr. David Anderson, 12/10/1998, Tr. 269**
Assessment:        Neuropathy secondary or diabetes and/or alcohol use

**Dr. David Anderson, 2/19/2002, Tr. 270-271**
Assessment:        Diabetic ulcer left big toe

**Minnie Hamilton Health Care, 2/27/2002, Tr. 272**
Assessment:        Diabetic ulcer left big toe

**Minnie Hamilton Health Care, 2/18/2002, Tr. 273**
Assessment:        Left great toe

**Stonewall Jackson Memorial Hospital, 12/25/2001, Tr. 480-484**
Final Diagnosis:      Diabetic ketoacidosis;
                    Diabetic peripheral neuropathy.

**Dr. David Anderson, 5/30/02, Tr. 485**
Assessment:  1.      L Gr III I, 1st resolved.
                2.      Paronychia L 4th.

D.     <u>Testimonial Evidence</u>

## 1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 586-638):

Q       Okay.  I - - looking at the records, I take it the main problem you have is from your diabetes?

A       Yes.

Q       And tell me how that affects you.

A       When it gets really low, like down below 60, I get really shaky and sweat, and I mean, if there ain't somebody there to do something or if you don't act and do something really quick, you could pass out and go into a coma.  And there's nobody around during the day.  I'm at home all by myself, because my wife, she has to work, and my kids, when they're in school, there - - nobody there unless I go see my neighbor, Wayne [phonetic].

                    *              *              *

Q       Okay.  Now what happens if the sugar is high?

A       Well, it get - - when it gets high, I get really sleepy and, I mean, it just knocks you out and you'll sleep and sleep and sleep and sleep.

                    *              *              *

Q       Okay.  And any - - now you injured - - you have a diabetic ulcer on your foot now?

A       Yeah, on my big toe.

Q       On your big toe?

A       On my right foot, big - -

Q       Right foot?

A       - - toe.

Q       Okay.  How long has that been there?

A       Well, it's let's see.  When did that happen?  Back - - I think it happened in February, I think.  When I first noticed it, it was in February.

Q       And are they - - they're treating it - - they're - -

(At this point, the Administrative Law Judge went off the record.)

(On the record.)

ALJ          [INAUDIBLE]

CLMT         No.  It's - - well, they ain't took it off or nothing.

BY ADMINISTRATIVE LAW JUDGE:

Q       Well - - I'm sorry.  I can't hear you.

A       They ain't amputated it or nothing, no.

Q       So there's - - they're treating it, and is it getting better?

A       Yeah.  It looks better than it did.

Q       Um-hum.  How far can you walk at a stretch before the - - before this problem with your toe?

A       I could walk a lot, before I got my toe hurt and stuff.  I'm not - - can't get around that good now.  It - -

Q       Yeah.  Well, you look like you're walking in pain now.

A       Yeah.  It hurts.

Q       I'm sorry?

A       Both my feet - -

Q       I'm sorry?

A       - - hurt.

Q       I can't hear you.

A       Both my feet hurt bad.

                    *           *           *

Q       When you were working construction.  Yeah.  Now can you use a knife and fork

okay?

A       I'm about afraid to fool with the knife.  Afraid to cut myself.

Q       Uh-huh.  How about - - can you hold up a cup or coffee or glass of milk?

A       Yeah.  If I keep my mouth real close to it so I won't spill it all at once.

                    *           *           *

A       Well, I can't read.  I can't see very good.  My eyes get real blurry.

                    *           *           *

Q       Do you have any problems getting dressed or bathing or eating?

A       It's hard to get my socks on and off because my feet hurt so bad.

Q       Do you have any hobbies or anything you still enjoy - -

A       I used - -

Q       - - at home?

A       - - to used to like to hunt and fish, but I can't get around hardly to do it anymore.

I mean, I can't - - there ain't no way I can get on a hill.

                    *           *           *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Okay.  All right.  Now I noticed you were having trouble walking from the hall in here, into the room.

A       Yes.

Q       Is your walking today different from the way you usually walk?

A       No.

Q       You seem to just almost be struggling for every step.  Is that - -

A       Yeah.

Q       How long has that - - has it been true that you've been walking the way I saw you?

A       [no audible response]

Q       How long has it been that you've been walking like that?

A       Well, probably six months or more.

ALJ        You've got to be - -

ATTY       He said - -

CLMT       Only six months.

ALJ        Okay.

BY ATTORNEY:

Q       Six months or more.  And what - - how was your walking before then?  Now I'm taking - -

A       Now I can - - I could walk better before then, but it's just getting worse and worse

and worse.

*          *          *

Q       Do you remember about how - - when you started having trouble or taking time to - - taking more time to have to make that walk?

A       Well, a couple years ago.

*          *          *

Q       Do you have any spells of either weakness or confusion?

A       Yes.

Q       Could you tell me a little bit about that?

A       Well, when you get weak, it's just like I don't - - just stagger around and [INAUDIBLE] around. You don't even know what you're doing and stuff. I guess that sugars is the - - causing it, because I don't feel like constantly, but when one of them spells hits you, you don't know when it's going to happen, you don't know what you're doing. If I would be driving down the road, I'd probably kill somebody.

Q       Well, is there anything in between? In other words, you've told us about the real bad spells where other people maybe have to come and more or less have to take care of you, help you get out of them. Do you have spells that are not that severe?

A       Yes, all the time.

Q       Could you tell me about that? What kind of spells are they?

A       Every other day, I get weak like that, and you can look down my sugar record and see how many 20s and 30s and 40s, and then when it gets down that low, I'm telling you, you're

14

sick.

Q        Okay.

A        Bad.

*            *            *

Q        Could you tell me when you started experiencing weak spells and how often they

occurred?

A        Yeah.  I had one - - let's see.  At least twice a week, sometimes more often than

that.  Two or three times every week, I get weak, at least.

Q        Now when that would happen to you, how long would it take before you could

come out of them?


A        An estimated guess, I'd say 30 to 35 minutes.

Q        Um-huh.  Okay. Had you noticed anything that would bring them on?

A        Well, sun.  It's being out in the sun. I can't be out in the sun and stuff.

Q        Okay.  Okay.  Now you've mentioned having to change your position around.

Are you all right?

A        Yeah.

Q        Now you've mentioned in the past having to change your position around.  Could

you tell me - - go back to the time that - - in '99 when you stopped working on the bathroom and

tell me what you did during the day?  In other words, what kind of positions you got in and why?

A        Well, when I was working on that?

Q        After that.

A        After that.

Q        Um-hum.

A        Just sitting and - - alternatively sitting and standing, trying to move around a little bit and stretch my legs.

Q        Okay.

A        You get stiff sitting around.  You get - - and I can't stand to be on them very long at a time anyway.

Q        Okay.

A        And I sleep a lot.  I sleep half the time at home.

Q        Tell me about your - -

A        I can't stay awake very long without going to sleep.

Q        All right.  Tell me about your sleeping.  When do you sleep?

A        Well, like a specific time?

Q        Yeah.  In other words, are you talking about night, are you talking about in the daytime?

A        Well, at night, in the daytime both.  Not all day long, but probably - - I probably sleep a good four hours a day.

Q        Is this at any - -

A        During the daylight hours.

Q        Is there any particular time that this occurs?

A        Usually after I eat, I get sleepy.

Q        Okay.  When this occurs, do you just drop off to sleep without trying to, or is this

something - - you'd lie down and take a nap, or - -

A No, I just get so tired I can't hold my eyes open.

Q So you just kind of - -

A I'm not even doing anything.

Q So you just drowse off. How long does this last?

A Oh, every time I go to sleep.

*   *   *

A Well, it could last an hour.

Q Okay. Could I ask you if you're in any pain?

A [no audible response]

Q Are you in any pain?

A Yes.

Q How long have you been in pain?

A Ever since I signed up, I guess. Even before that.

Q Could you tell me where you hurt?

A My feet, my legs.

Q Okay.

ALJ Where - -

CLMT My feet and legs.

BY ATTORNEY:

Q Well, what kind of pain is it?

A Sharp. I just feel like somebody run over my feet and stuff with a truck. It's not

17

like it's coming from outside in. It's, you know, like the inside want out. Just like something in and - - trying to job [phonetic] its way out or something.

Q       Do you have this pain if you're sitting still?

A       Constantly.

Q       So even if you're not walking, you have that?

A       Yes.

Q       How far up your legs does the pain come?

A       Oh, about six inches below my knees.

ALJ       Just below the knee?

CLMT       Yeah.

*       *       *

BY ATTORNEY:

Q       Do you have any numbness?

A       Yes.

Q       Where do you have numbness?

A       Feet and legs.

Q       Can you tell if you step on a rock or something like that? In other words, can you feel sharp objects if you step on something?

A       No. It's kind of like deadened. Dead is what you feel and stuff. I mean, you just feel like club [phonetic] is what it feels like. But I mean it hurts.

Q       Okay.

A       You - -

Q        Now - -

A        - - just feel like you got sticks.  Sticks with a big rock attached to them is what it feels like, and there's something inside that rock trying to poke its way out almost.

Q        Now this might be a hard question to answer, but on a scale from zero to ten - - now zero is no pain and ten is real bad pain, like you need to go to the emergency room and get a shot or something like that.  Where on the scale between zero and ten would you say your pain is - -

A        Eight.

Q        - - most of the time?

A        Eight.

Q        Okay.  Is there anything you do that makes it better or worse?  I know the judge asked you a little about this, but [INAUDIBLE].

A        Moving around too much seems like it makes it worse.   The morning. [INAUDIBLE] they really hurt really bad.

Q        What's the best it gets?

A        That's the one reason I alternately get down and up.

Q        Why?

A        To try to alleviate it.  You know what I mean?

Q        Okay.  Does it get better at times?   What's the best it gets?

A        It don't get any better.

Q        Okay.  Does this have any impact on your nerves or your nerve?

A        Yes.

Q       Would you tell me about that?

A       Well, [INAUDIBLE] question, you mean?

Q       Okay.  Does the pain have any impact on your mood?

A       Oh, on my mood.

Q       Um-hum.

ALJ       Your depression.

CLMT       Yes.

ALJ       [INAUDIBLE]

CLMT       It really messes with your mind. It does mine.

                    *               *               *

Q       Do you ever get down, sad, where you have any crying spells, anything like that?

A       Yes.

Q       How often does that happen?

A       Well, at least once a month.

Q       Okay.  When that happens, is there any cause?  Anything in particular that causes that?

A       Well, feeling like I ain't no good and stuff because I don't work anymore.

Q       Okay.

A       I can't work.

Q       Is - - when that happens to you, how long does it last?

A       Oh, a couple hours.

Q       Have you ever felt like hurting yourself or doing away with yourself?  Anything

like - -

A Yeah.

Q - - that?

A I've thought about it.

Q How often do you think about it?

A Once a month.

Q Okay.  Have you ever made any plans - -

A No.

Q - - that you'd actually do it?

A No.

Q Would you?

A I don't know.

## 2. Claimant's Friend Clarence W. Cottrell

Testimony was taken at the hearing from Claimant's friend Clarence W. Cottrell, who testified as follows (Tr. 638-646):

Q Well, they'll call me.  Daddy's sick or Daddy's passed out or something.  Then I go up there and his sugar is just so low, he just goes to sleep and breaks out in a deep sweat, and you've just got to put pop, sugar, whatever you can get in him.  Thirty minutes, he's back to normal, you know, where he can function.  But at that time, he's semi-conscious.  He just can't function.  He just - -

    \*    \*    \*

Q All right.  What can you tell me about his diabetic condition after about '99?

Now the reason I say '99, that was the time that he last worked.  What can you tell me since then?

A       I've watched him go into what I call a - - I call it a low-sugar coma.  I don't know what the words are for it.

Q       That's all right.

A       I've watched him go from when he first was diagnosed when - - until when he could still walk real well to now he has a lot of trouble walking.  I also take him to the hospital last December when his blood sugar was over 470.  I've just watched him over the three years.  I've watched him just deteriorate further and further.

Q       Well - -

A       Then the other night, I thought I'd lost him.  I thought he had died.

Q       When was this?

A       That was Tuesday night.

Q       What happened then?

A       Well, his sugars went down so low, he dropped out on me and I couldn't get him to - - most of the time, you know, he can still hear - -

Q       Um-hum.


A       - - but his reactions are slow.  And this time, he was just laying there and just quivering and shaking and I finally just started pouring stuff through them old whiskers and got him some Pepsi.   Only a little bit, he opened back up there then.  That was one time I was really scared.

Q       Okay.  Do you help him out?

A       All the time.

Q       What do you do for him?

A  well, I take him to the store if he needs to go.  I take him to his doctors' appointments.  I make his doctors' appointments.  Just whatever needs to be done.

Q       Does he need your help?

A       Oh, yes, ma'am, because nobody else will help him.

Q       Well, does he need someone to help him?

A       He needs someone.  Actually, I can't express a professional opinion, but my feelings are someone should be with him around the clock.

Q       Why?

A       Because his sugar will go sky-high, then within an hour, it'll be so low he just conks out.  He - - matter of fact, more than one time, he told me he passed out and he don't know how he got there and he don't know how long he was laying there.

*                    *                    *

Q       All right.  Could you tell me from about '99 what his physical condition was as far as being able to walk or get around, do things for himself?

A       He could still function primarily, and he could walk well, talk well.

Q       Okay.

A       He wasn't in no pain like he is anymore.

Q       Um-hum.

A       Since then, it's just deteriorated to where he has a lot of trouble walking and he's

in pain and so on.

Q        All right.  Do you think he's in a situation where he could work for somebody - -

A        No - -

Q        - - in an - -

A        - - ma'am.

Q        - - easy job?

A        No, ma'am.

Q        Why not?

A        Because his legs hurts him and his feet hurts him severely, and with the amount of work that he's done all of his life, I don't think that he's able just to sit - - where he could just sit in that environment with his feet and legs down.

Q        You mean sitting in a normal chair?

A        Just like we are now, because after a while, it just hurts him so bad that he's got to have something to lay his feet up on.

Q        Well, in terms of just observing him, at what point in time do you think he got so bad off that he couldn't do something like that, something easy?

A        [no audible response]

Q        Now we're thinking on a day-to-day basis.

A        Two years.

Q        Is there anything in particular that stands out in your mind that makes you say that?

A       No, other than I've just been there every day and I've watched him and I've watched his health go from good to worst to worst to worst to worst.

Q       When he comes over to your house, what do you do?

A       Well, we generally sit around for a little while and talk, and then he'll generally lay down on the couch and put his feet up on the couch so he's not - - he don't hurt so much. And then we sit around and we watch TV, maybe even have a little miniature AA meeting between ourselves, and - -

Q       Okay.

A       - - we just have a good time.  We're good friends.

Q       Okay.  What can you tell me about his state of mind?

A       He talks good.  I think he's clear-minded, but he's got stuffed animals.  He likes to sit around and talk to them.  That's the best way I can describe - - because I told him he was crazy.

Q       Do you think he has any trouble with depression?

A       Yes, ma'am.

Q       What do you think of when you think of depression?

A       He likes to be - -

Q       What do you - -

A       - - alone.  He likes to be away from the family.  At times, highly irritable.  He can - - my - - for an example, he can be sitting there talking to me just as calm as can be, and within 20 minutes, I got to get out of here.  I got to go home.  And I mean, his attitude, the tone of his voice - - everything changes, and I myself, I've dealt with depression for - - now for - - well,

since '66, since I come in - - home from Vietnam, so I know a little about depression.

Q       As far as any spells of weakness or confusion or anything like that, have you noticed anything like that about him?

A       Well, I just thought that was all just sugar-related because he - - like I say, he just goes weak and he - - it's like he goes to sleep, and he just sits there and he just shakes. That's the only way I can describe it. I - - you know, I'm not an expert at - -

### 3. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 646-655):

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       Mr. Bell, would the Claimant have developed any transferable skills from his prior jobs to current work?

A       No, Your Honor.

Q       Let me give you a hypothetical question. If we assume a person of the same age, education and work experience as the Claimant, assume a person who's able to do light work as that's defined in the Commissioner's regulations. But assume the person, if they're standing or walking, would need to sit briefly at least every half hour, and if they're sitting, would need to stand briefly every hour. And by briefly, I mean for one to two minutes, just a brief period. The job should not involve - - no more than rare work in the sun, no more than occasional climbing, balancing, kneeling, stooping or crouching or crawling. No concentrated exposure to cold or significant workplace hazards. The person should be able to check their blood sugar at least

twice a day.  It'd take - - maybe take about five minutes, and they should be in a job where they can eat small snacks at the workplace.  The job should not involve detailed or complex instructions, and no close concentration for attention to detail for extended periods of time.  No close interaction with coworkers or supervisors.  No fast-paced or assembly-line work, and - - okay.  No more than rare requirement to make decisions or set own goals, and may be able to miss up to two days per month.  Would there be any jobs such a person could do?

A       Yes, Your Honor.  At the light level, mail clerk.  Two hundred two thousand nationally, 1,050 regionally, and the DOT number is 209.687-026.  An office cleaner, light.  Four [INAUDIBLE] nationally, 8,000 regionally, and the DOT number is 323.687-014.

Q       Any sedentary?

A       Machine tender, sedentary.  One hundred forty-one thousand nationally and 1,400 regionally.  A DOT example is 689.585-018.  And general office clerk, sedentary.  Two hundred ninety-nine thousand nationally, 2,900 regionally, two - - DOT 209.587-010.

Q       Okay.  Is your testimony consistent with the DOT?

A       Yes, sir.

Q       Okay.  Go ahead, Mrs. Van Nostrand.

ATTY All right.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       I want you to assume that our hypothetical individual should alternate standing and walking at one time, only for about ten minutes at a time.  That he should be up on his feet standing and walking without being allowed to rest, and that this person would need to have frequent rest periods sitting during the day, and that would mean rest from work, not just sitting

down.  And I'm wondering what impact that would have on the jobs that you've identified if frequent rest periods were needed.

A       How many is that?

Q       Okay.  That - -

A       What - -

Q       - - what have the - -

A       - - does that mean?

Q       - - same definition that Social Security would use, so that would mean that two-thirds of the time, this person would need to have the opportunity to take breaks - - short breaks, as needed.

A       How long are the breaks?

Q       We'll have to say in excess of normal break periods.

ALJ       I'm sorry.  I can't hear you.  In excess of what?

ATTY       Normal break periods.

VE       How long do the breaks - - how do - - long do these frequent rest periods last?

ATTY       Ten or 15 minutes.

VE       Okay.  Well, the first part of the hypothetical would eliminate the light jobs because you're - - half the time, you're not able to sit, if I understand correctly there.  And then the frequent rest periods, that would eliminate all of those jobs.  That wouldn't be compatable with a competitive work routine.

BY ATTORNEY:

Q        So the - - if a person needs frequent rest periods, normally an employer is not going to allow frequent rest periods?

A        That's what I just said.  Yeah.


Q        Okay.  Now I'd like for you to instead of that assume that this person needs to have the opportunity to recline or lie down during the day with the feet up, and this was off and on during the day, as needed.  Would any of these jobs permit that?

A        No.

Q        Okay.  I want you to assume instead of that the person experiences intermittent pain that would be - - well, actually chronic, severe pain.  Chronic severe pain, and that the person's mood and ability to persevere and attend to tasks on a regular basis would be impacted regularly, frequently due to the pain level.  Would such a person be able to perform the jobs that you've identified?

A        I don't believe they'd be able to keep a competitive routine if they're - -

ALJ        I'm - -

VE        Up to two-thirds of the time.

ATTY        Okay.

ALJ        Okay.  I'm sorry.   I'm - - the question was if the person has chronic severe pain?

ATTY        Um-hum.

VE        Up to two-thirds of the time.

ALJ        Up to two-thirds of the time.  Was it a - - specified beyond that?

ATTY          No.

ALJ           Okay.  Go ahead, Mr. Bell.

VE            That's all I had, Your Honor.

ALJ           And what did you say?

VE            I said that if up to two-thirds of the time they're having severe pain that interferes with their ability to attend to tasks and be persistent, then they're not going to be able to work.

ATTY          Okay.  Let's see here.  Okay.

BY ATTORNEY:

Q        So I'm just going to phrase this a little bit differently, and I want you to assume that from one-third to one-half of the time, the person is going to be unable to maintain a regular work schedule.  And that this is going to affect not only attendance, but punctuality, and also the number of breaks are going to be more than normally provided.  They're going to need - -

A        We already did the frequent breaks - -

Q        Okay.

A        - - I thought.

Q        This is the less - - this is lesser.   Instead of two-thirds of the time, this is going down to one-half the time, and I'm wondering if that would - -

A        That wouldn't change my - -

Q        Wouldn't - -

A        - - answer.

Q        - - change your - -

A      No.

  E.      <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

- Alcoholism. (Tr. 312, 398).

- Cooks his meals. (Tr. 597).

- Can lift 10-15 pounds once an hour. (Tr. 602, 623).

- Spends time with his friend Wayne. (Tr. 603).

- Walks to Wayne's house. (Tr. 603, 604, 621).

- Attends AA meetings with Wayne once a week. (604).

- Reads. (Tr. 612).

- Exercises. (Tr. 612).

- Naps four (4) hours daily. (Tr. 627).

- Watches the television. (Tr. 631).

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) by failing to give appropriate weight to the opinions of the treating physicians and to provide adequate reasons for rejecting them; (2) by failing to contact the treating sources in violation of SSR 96-5p; (3) by failing to properly weigh the opinions of the examining psychologist and to give appropriate weight to the specific work

limitations assessed; (4) by improperly assessing Claimant's credibility; and (5) by improperly relying upon an incomplete and inaccurate hypothetical question to the vocational expert and in ignoring favorable testimony of the vocational expert.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly evaluated and weighed the medical opinions contained in the record; (2) did not err by not recontacting Claimant's treating sources; (3) properly evaluated the evidence relating to Claimant's mental health; (4) conducted a proper credibility analysis, pursuant to SSR 96-7p; and (5) included and accounted for all of Claimant's limitations in the hypothetical question posed to the vocational expert.

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3. <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4. <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status - Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all

of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.      Social Security - Treating Physician - Opinion that Claimant is Disabled.  An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927.  A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability.  Id.  No special significance will be given to the source of an opinion on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

11.      Social Security - Treating Physician - Not Entitled to Controlling Weight.  When not

entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. §§ 404.1527(d), 416927(d). When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s). 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

12. Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

13. Social Security - Treating Physician - No Controlling Weight - When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled, the determination or decision, "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

14. Social Security - Treating Physician - Speculative Opinion. An ALJ is not bound to accept the opinion of a treating physician which is speculative and inconclusive. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

15. Social Security - Treating Physician - Definition. A "treating source" is defined as

a claimant's own "physician, psychologist, or other acceptable medical source" who provides a patient with medical treatment or evaluation and has an ongoing treatment relationship with the patient. 20 C.F.R. 404.1502. When the medical evidence establishes that the patient sees the physician with a frequency consistent with accepted medical practices for the type of treatment required, an ongoing treatment relationship is deemed to exist. See id. The term "other acceptable medical source" is defined as a licensed physician, a licensed osteopath, a licensed or certified psychologist , a licensed optometrist, and "persons authorized to send us a copy of summary of the medical records of a hospital, clinic, sanatorium, medical institution, or health care facility." 20 C.F.R. § 404.1513.

16. Social Security - Ultimate Issue. Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id.

17. Social Security - Subjective Complaints of Pain. Claimant's statements alone are not enough to establish that there is a physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a). Claimant's statement about her pain or other symptoms will not alone establish that claimant is disabled. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Pain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence or lack thereof. Id. at 592 (citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)).

18. Social Security - Claimant's Credibility - Pain Analysis. The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an

impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

19. Social Security - Claimant's Credibility. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

20. Social Security - Residual Functional Capacity. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their

impairments.  Id.

21.     Social Security - Vocational Expert. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

22.     Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[5], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

23.     Social Security - Vocational Expert - Hypothetical - Claimant's Counsel.  Based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

C.     Discussion

    1. FAILURE TO GIVE CONTROLLING WEIGHT TO CLAIMANT'S TREATING

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

Claimant asserts that the ALJ erred by failing to give controlling weight to the medical

testimony of Claimant's treating physicians, Dr. Proctor, Dr. Anderson and Dr. Dawlah, and to

provide adequate reasons  for rejecting their opinions.  The Commissioner counters that the ALJ

properly evaluated the medical opinions of record and properly declined to give Claimant's

treating physicians' opinions controlling weight.

All medical opinions are to be considered in determining the disability status of a

claimants.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such

as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R.

§§ 404.1527(e)(1)-(3), 416.927(e)(1).  Statements by medical sources to the effect that a claimant

is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that

support such statements.  Id.  The opinion of Claimant's treating physician is entitled to great

weight and may only be disregarded if there is persuasive contradictory evidence.  Evans v.

Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in

appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and

severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-

supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not

inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2). See

Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given

controlling weight only when it "is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician is entitled to great weight, it will be

disregarded if there is persuasive contradictory evidence. <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984). To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1. (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001).

"If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3. The ALJ undertook such an analysis here. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>. The Court's review reveals that the ALJ reasonably resolved all such conflicts and that the record more than adequately bears

our his conclusions.

Claimant cites § 404.1527(d)(2) for the proposition that the ALJ failed to account for the factors set forth in § 404.1527(d)(2). Claimant, however, does not cite Fourth Circuit case law indicating that there are circumstances under which an ALJ must explicitly discuss each of the section 404.1527(d)(2) criteria. In the instant case, although the ALJ did not explicitly and specifically reference the factors enumerated in § 404.1527(d)(2) with reference to Drs. Proctor, Anderson and Dawlah's opinions, he did discuss some of the relevant factors in narrative form. The ALJ summarized almost the entire medical record before him. (Tr. 25-30). The ALJ then properly determined that the opinions of Dr. Anderson and Dr. Proctor were not entitled to great weight. (Tr.25-27).

With respect to Dr. Anderson, the ALJ noted that Dr. Anderson opined that the stress caused by working would increase Claimant's sugar and worsen his symptoms. (Tr. 27). Although Claimant alleges that "there was no effort to determine whether the finding of 'uncontrolled diabetes' and 'severe pain/tingling' were entitled to controlling weight and whether the clinical observations/findings of circulatory, sensory, and gait changes provided underlying support for the doctor's statements" (Pl.'s Br. at 10), the ALJ specifically considered Claimant's diabetes, feet neuropathy and diabetic ulcer of the right toe. (Tr. 24, 31).

The ALJ also considered Dr. Proctor's records and noted that Dr. Proctor treated Claimant from October 1, 1993 through January 4, 2000. Dr. Proctor opined that Claimant could only work part-time. (Tr. 245, 315-316). Having considered "all of the medical opinions in the record" (Tr. 25, 32), the ALJ determined that "the limitation to part-time work is not well supported in the clinical findings." (Tr. 28). Additionally, even Dr. Proctor opined that Claimant is capable of

41

performing sedentary work. (Tr. 314-316). Therefore, the ALJ gave proper weight to the opinions of Claimant's treating physicians.

Finally, the ALJ considered Dr. Dawlah's records and afforded some, but not controlling, weight to the April 16, 2002 opinion of Dr. Dawlah (Tr. 26). In his April 16, 2002 residual functional capacity assessment, Dr. Dawlah opined that Claimant was capable of part-time sedentary work requiring no walking or lifting. (Tr. 26). Dr. Dawlah also opined that Claimant could not perform repetitive actions, such as simple grasping with his arms or fine manipulations with his hands. (Tr. 26). The ALJ observed that the medical evidence of record failed to document any such limitations or hand-related complaints. (Tr. 26). Additionally, Dr. Dawlah's opinion that Claimant could perform only very limited part-time work was inconsistent with his prior opinion wherein he recommended vocational rehabilitation. (Tr. 26). Therefore, Dr. Dawlah's opinion was "only given some weight." (Tr. 26).

Accordingly, the ALJ properly evaluated the medical opinion evidence of Dr. Anderson, Dr. Proctor and Dr. Dawlah.

## 2. FAILURE TO RECONTACT CLAIMANT"S TREATING PHYSICIAN PURSUANT TO SSR 96-5P

Claimant further contends that the ALJ failed to recontact Claimant's treating physician, Dr. Dawlah. The Commissioner counters that the ALJ properly evaluated Dr. Dawlah's opinion and, therefore, was not required to recontact him.

20 C.F.R. § 404.1512(e) provides in pertinent part:

> (e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

42

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques....

SSR 96-5p provides in relevant part:

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Claimant alleges that the ALJ "was in doubt as to the basis for Dr. Dawlah's opinion regarding a limitation to part-time work in view of the need for vocational rehabilitation." (Pl.'s Br. at 13). As a result, Claimant alleges that the ALJ was obligated to recontact Dr. Dawlah to seek clarification. Id. However, the regulations only require the Commissioner to recontact a treating physician when "the evidence we receive from your treating physician...is inadequate for us to determine whether you are disabled." 20 C.F.R. § 404.1512(e). In the present case, Claimant submitted evidence from multiple treating and examining physicians. Contrary to Claimant's argument, the ALJ found Dr. Dawlah's assessment inconsistent with his earlier opinion and the other evidence of record, and not "inadequate." 20 C.F.R. § 404.1512(e). See Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995)(an ALJ may reject the opinion of the treating physician when it is internally inconsistent). Moreover, the extensive medical records in this case clearly provide an adequate basis for the Commissioner's determination that Claimant is not disabled. Therefore, because the ALJ had sufficient evidence to make a disability determination, he not required to recontact Dr. Dwalah.

3. **THE ALJ FAILED TO WEIGH THE OPINION OF THE EXAMINING PSYCHOLOGIST AND TO GIVE APPROPRIATE WEIGHT TO THE SPECIFIC WORK LIMITATIONS ASSESSED**

Claimant next contends that the ALJ should have adopted the functional assessment of psychological evaluators, Dr. Steward and Ms. Posey. The Commissioner counters that the ALJ's mental RFC is supported by the record.

Claimant asserts that the ALJ failed to weigh Dr. Steward and Ms. Posey's report as mandated by 20 C.F.R. § 404.1527(d). The five factors to be considered under 20 C.F.R. § 404.1527(d) are: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.

In his decision, the ALJ noted that Dr. Steward and Ms. Posey are not Claimant's treating physicians. They examined the Claimant on referral from Claimant's counsel. The ALJ declined to accept their assessment in its entirety because Dr. Steward and Ms. Posey noted that Claimant put forth an inconsistent effort on all items. (Tr. 27). Dr. Steward and Ms. Posey also deemed the results of Claimant's Personality Assessment Inventory to be invalid. (Tr. 27). Moreover, the results of their examination were based largely upon Claimant's subjective complaints. (Tr. 27).[6]

As was noted above, it is the duty of the ALJ, not the courts, to make findings of fact and

---

[6] Claimant cites <u>Stanley v. Barnhart</u>, 116 Fed. Appx. 427 (4th Cir. 2004), where the Court held that the ALJ could discount a report because it was basely solely upon subjective statements, in attempt to distinguish the instant case. <u>But</u> <u>see</u> <u>Craig v. Chater</u>, 76 F.3d 585, 590 n.2 (4th Cir. 1996)(noting a doctor's notation of a claimant's complaints of pain did not transform a subjective complaint into objective evidence).

resolve conflicts in the evidence. Hays, 907 F.2d at 1456. The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. In the instant case, the ALJ properly considered evidence provided by those physicians in context of other medical evidence. (Tr. 27). The ALJ's findings were supported by the record. Therefore, the ALJ afforded proper weight to Dr. Steward and Ms. Posey's opinion.

### 4. FAILURE TO CONDUCT A PROPER CREDIBILITY ANALYSIS

Claimant asserts that the ALJ erred in determining his credibility. Commissioner counters that the ALJ properly determining Claimant's credibility.

Unfortunately for Claimant, his argument is without merit. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). The ALJ must apply a two-step analysis when assessing the credibility of a claimant's subjective complaints of pain. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

In this case, the ALJ correctly applied the Craig test. The ALJ found that Claimant "has presented medical evidence showing that he has impairments that could reasonably be expected to produce some pain and other subjective limitations." (Tr. 29). Specifically, the ALJ found that Claimant had diabetes, feet neuropathy, diabetic ulcer, retinopathy and depression. (Tr. 24, 31).

The ALJ considered Claimant's subjective complaints of debilitating symptoms in light of the entire record in accordance with the second prong of Craig and found that the objective evidence did not support the alleged severity of Claimant's complaints. (Tr. 29). The ALJ noted that "the objective medical evidence nor the testimony of the claimant establishes that the ability to function has been so severely impaired as to preclude all types of work activities." (Tr. 29). The ALJ was in the best position to observe Claimant at the hearing and evaluate his credibility. The ALJ pointed to Claimant's daily activities, finding that they undermined his complaints of debilitating limitations. (Tr. 29). The ALJ noted that Claimant retained the ability to maintain his personal hygiene; prepare his own meals; read; visit and socialize daily with his friend; walk (slowly) 1000 yards to his friend's house; watch television; sit for extended periods of time; attend AA meeting; maintain a record of his blood sugar readings; and attempt to exercise. (Tr. 24, 29).

Moreover, the ALJ noted also noted that Claimant's diabetes was under better control when he was compliant with his medication, abstained from drinking and followed a diabetic diet. (Tr. 29). The ALJ also pointed out that, although Claimant testified that he last drank alcohol in January, 2002, his medical records demonstrate that he continued to drink thereafter. (Tr. 28). Claimant also failed to comply with his treatment, declined tests recommended by his doctors and did not put forth his best efforts during his psychological evaluation. (Tr. 28-29).

Having considered all the evidence in accordance with the second prong of Craig, the ALJ is in the best position to determine Claimant's credibility.  Although the ALJ determined that Claimant had medically demonstrable severe impairments, the ALJ also determined that Claimant's testimony was not fully credible and inconsistent with his medical record.    (Tr. 29).  Nonetheless, it should be noted that the ALJ still credited Claimant's subjective complaints by limiting him to a reduced range of sedentary work.  In light of the above discussion, the ALJ properly assessed Claimant's credibility.

5.    THE COMMISSIONER IMPROPERLY RELIED UPON AN INCOMPLETE AND INACCURATE HYPOTHETICAL QUESTION TO THE VOCATIONAL EXPERT AND IGNORED FAVORABLE TESTIMONY OF THE VOCATIONAL EXPERT

Finally, Claimant alleges that the ALJ should have included additional limitations in the hypothetical question to the vocational expert.  The Commissioner counters that the limitations included in the hypothetical question to the vocational expert are supported by the record.

The question is whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments.  The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record.   Russell v. Barnhart, No. 02-1201, 2003 WL 257494, at ** 4 (4th Cir. Feb. 7, 2003).  The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe.  Id.   Moreover, based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D.

Md. 2000) (citing <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir.1986)).

The ALJ's hypothetical to the vocational expert incorporated Claimant's limitations that are supported by the record. The ALJ asked the VE to identify sedentary jobs that accommodated the following limitations: an option to sit or stand briefly at least every half hour; no more than rare work in the sun; no more than occasional climbing, balancing, kneeling, stooping, crouching or crawling; no concentrated exposure to cold or significant workplace hazards; allows checking of blood sugar at least twice per day; permits eating small snacks at workplace; no detailed or complex instructions; no close concentration or attention to detail for extended periods of time; no close interaction with co-workers or supervisors; no fast-paced or assembly line work; no more than rare requirement to make decisions or set own goals; and permits p to two absences per month. (Tr. 648-49). The VE identified the sedentary jobs of machine tender and general office worker as positions that would accommodate all of the restrictions in the ALJ's hypothetical. (Tr. 31). The ALJ correctly declined to credit the VE's testimony given in response to Claimant's counsel's question that no jobs would accommodate frequent rest breaks or a failure to attend to tasks because of chronic and severe pain. Pl.'s Br. at 18-19. <u>See</u> <u>France v. Apfel</u>, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir.1986)). Accordingly, the ALJ properly included all of Claimant's impairments supported by the evidence of record in posing the hypothetical question to the vocational expert and properly rejected restrictions included in hypothetical questions suggested by a claimant's counsel.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED

48

because the ALJ was substantially justified in his decision.  Specifically, the ALJ (1) properly evaluated the medical opinion of record;  (2) was not required to recontact Claimant's treating physician; (3) properly rejected the functional assessment of psychological evaluators; (4) conducted a proper credibility analysis; and (5) accounted for all of Claimant's  limitations in the hypothetical question posed to the vocational expert.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE