**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


ROGER L. BUSH,

        **Plaintiff,**

v.                          **CIVIL ACTION NO. 1:04CV258**
                                **(Judge Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        **Defendant.**


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on December 21, 2004, the Court referred this Social Security action to United States Magistrate James E. Seibert with directions to submit proposed findings of fact and a recommendation for disposition. On January 9, 2006, Magistrate Seibert filed his Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Report and Recommendation.

      On January 18, 2006, counsel for plaintiff, Roger L. Bush, filed objections to the Magistrate's Report and Recommendation. On February 1, 2006, the defendant filed a response to the plaintiff's objections.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### I.  PROCEDURAL BACKGROUND

On December 25, 1998, Roger L. Bush ("Bush") filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments alleging disability since August 10, 1998 due to diabetes mellitus. On January 27, 1999, the Commissioner denied the application initially and on reconsideration. On April 22, 1999, Bush filed another application for DIB and SSI again alleging disability beginning August 10, 1998 due to diabetes mellitus. On June 2, 1999, the Commissioner denied this claim at the initial level. On July 24, 2000, Bush filed another application for DIB and SSI alleging disability beginning August 10, 1998 due to diabetes mellitus, foot neuropathy, depression and diabetic ulcer on the right big toe which the Commissioner again denied initially and on reconsideration.

On June 27, 2002, an Administrative Law Judge ("ALJ")conducted a hearing. Bush appeared in person and represented by counsel. In addition to Bush, a vocational expert and a witness also testified.

On October 8, 2002, the ALJ found that Bush was not disabled within the meaning of the Act. On October 22, 2004, the Appeals Council denied Bush's request for review of the ALJ's decision. On

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

December 21, 2004, Bush filed this action seeking review of the final decision.

## II.  PLAINTIFF'S BACKGROUND

At the time of the hearing, Bush was thirty-nine (39) years old and had a high school equivalency diploma. His past relevant work experience included employment as a construction worker.

## III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found:

1.  Bush met the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through the date of his decision;

2.  Bush had not engaged in substantial gainful activity since the alleged onset of disability and that the work performed in 1999 was an unsuccessful work attempt;

3.  Bush's diabetes, foot neuropathy, diabetic ulcer of the right toe, retinopathy, and depression when considered in combination are "severe" based on the requirements in Regulations 20 CFR §§ 404.1520(b) and 416.920(b) but do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

4.  After consideration of all of the medical opinions in the records, regarding the severity of his

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

impairments, Bush's allegations regarding his limitations are not totally credible;

5.  Bush retains the residual functional capacity for sedentary work that permits standing briefly at least every hour, no more than rare work in the sun, no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling, no exposure to concentrated cold or to concentrated levels of workplace hazards, ability to periodically check blood sugars at the work site and eat small snacks if necessary, no detailed or complex instructions, no close concentration or attention to detail for extended periods, no close interaction with coworkers or supervisors, no fast paced or assembly line work, no more than rare requirement to make decisions or to set his own goals, and ability to miss up to two days per month;

6.  Bush is unable to perform any of his past relevant work;

7.  Bush is a "younger individual" pursuant to 20 C.F.R. §§ 404.1563 and 416.963;

8.  Bush has a "high school (or high school equivalent) education";

9.  Bush has no transferable skills from any past relevant work;

10. Bush has the residual functional capacity to perform a significant range of sedentary work and, although his exertional limitations do not allow him to perform the full range of sedentary work, using Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform, including machine tender (1400 jobs regionally and 141,000 nationally) and general office worker (2900 regionally and 299,000 nationally); and

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

11.  Bush was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

### IV.   PLAINTIFF'S OBJECTIONS

Bush objects to the report and recommendation and alleges that the ALJ:

1)  failed to properly consider the opinions of his treating physicians, specifically Dr. Dawlah, Rick Fogle, PA-C, Dr. Proctor and Dr. Anderson;

2)  failed to analyze his condition pursuant to Diabetes listing 9:09 [sic];

3)  failed to contact his treating physician for clarification or additional information;

4)  failed to retain the services of an IME for purposes of the hearing;

5)  failed to give any weight or credit to the psychological evaluation of Cardinal Psychological Services based on the finding that Bush was not "totally credible";

6)  failed to follow SSR 96-7p in the analysis of Bush's pain and credibility; and

7)  failed to identify the substantial evidence in the record supporting his findings.

### V.   MEDICAL EVIDENCE

The record contained the following medical records relevant to the time period, August 10, 1998 through October 8, 2002:

1.  A December 10, 1998 report from Dr. Anderson indicating that Bush's general health was fair;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

2.   A December 10, 1998 office note from Dr. David Anderson indicating complaints of severe pain BL lower extremity for one year with increased intensity in the past two months. Bush reported that his sugar was running 400-500 and that he had not seen his medical doctor in a long time. The assessment was neuropathy secondary to diabetes and/or alcohol use;

3.   A December 28, 1998 office note from Dr. David Proctor, indicating a diagnosis of insulin dependent diabetes and peripheral neuropathy. Dr. Proctor noted complaints of diabetic neuropathy in Bush's feet resulting in numbness and pain;

4.   A January 7, 1999 report from Dr. Anderson to the Division of Rehabilitation Services, indicating a diagnosis of severe peripheral neuropathy and uncontrolled diabetes. Dr. Anderson recommended that "this patient should be 'home-bound' until his diabetes is brought under control and his symptoms have subsided;"

5.   A January 20, 1999, West Virginia Department of Health and Human Resources report from Dr. Proctor indicating a diagnosis of major: diabetes mellitus and minor: diabetic neuropathy. Dr. Proctor indicated that this was a new onset of uncontrolled diabetes and increased and adjusted Bush's medications. He further

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

indicated that Bush was unable to perform full-time work at this time but that he might be able to work in a few months if the drugs controlled the diabetes;

6.    A January 22, 1999 residual physical functional capacity report ("RFC") from Hugh M. Brown indicating no exertional postural, manipulative, visual, communicative, or environmental limitations;

7.    A February 11, 1999 office note from Dr. David Anderson indicating complaints of "increased soreness in the same area" and a discussion of all causes and treatments for neuropathy. Bush refused treatment at that time;

8.    A June 2, 1999 RFC from James Kuzniar indicating Bush could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand about six hours of an eight hour day, could sit about six hours of an eight hour day, had unlimited ability to push and/or pull, had occasional postural limitations in balancing, stooping, kneeling, crouching and crawling, had no manipulative, visual or communicative limitations and needed to avoid extreme cold, extreme heat and heights. Kuzniar reduced Bush's RFC to light due to the functional limitations and pain;

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

9.    A May 17, 2000 report from Dr. Anderson to the West
Virginia Department of Education and the Arts, Division of
Rehabilitation Services, indicating a diagnosis of peripheral
neuropathy, BN, VE, Dr. Anderson noted that, due to a missed
appointment, he was unable to assess the effect of the treatment;

10.    A July 5, 2000 admission record from Stonewall Jackson
Memorial Hospital, indicating:

> The patient is 37 years old and was admitted
> with mid sternal chest pain without any
> radiation and not responding to sublingual
> Nitroglycerin and non compliance with
> hypoglycemic with uncontrolled diabetes
> mellitus and early diabetic ketoacidosis. The
> patient was admitted to the unit on insulin
> drip and IV hydration and for cardiac enzymes.
> The patient was admitted on an insulin drip.
> His blood sugar was better controlled. He
> eventually was switched to oral hypoglycemic
> and with four times a day finger stick and
> regular insulin coverage. His cardiac enzymes
> were negative. He had a treadmill test on the
> following day which was reported by Dr.
> Sabbagh as negative. His electrolytes on the
> following morning were normal. His glucose was
> 158 and he was switched to finger stick four
> times a day with regular insulin coverage. His
> potassium was normal. His blood sugars were
> ranging from 224 to 240. On July 4, 2000 his
> blood sugar was 240. His electrolytes were
> normal. His cardiac enzymes were negative. The
> patient had no further chest pain. His
> treadmill was negative and Dr. Sabbagh was
> consulted. His electrolytes were followed up
> and were normal. His blood sugar was better
> controlled ranging 200 and below. His EKG

**ORDER ADOPTING MAGISTRATE JUDGE'S<br>REPORT AND RECOMMENDATION**

> showed normal sinus rhythm and the patient was anxious to go home. His EKG was normal and showed no changes. Eventually after the patient had been discharged, the chest x-ray report was revealed and that will be followed up as an outpatient. The patient will be called to have another chest x-ray. He was advised to stop at the office and get samples of Glucotrol and [a prescription] was called into the pharmacy.

> Condition, Treatment, Final Disposition on Discharge & Prognosis: The patient was discharged on July 5, 2000. At the time of discharge, he was much improved. He had no further chest pain.

At discharge, the recommendations were a 1,500 calorie ADA diet, activities as tolerated, one aspirin a day, zantac over the counter as needed 150 mg, tylenol over the counter as needed for chest wall pain and glucotrol XL 10 mg daily.

11. A July 8, 2000 Gilmer Primary Care report from Douglas Dalton, PA-C indicating that Bush was a new patient and had come to the clinic following a hospitalization at Stonewall Jackson Memorial Hospital where he was told that his "diabetes was out of control." Dalton's assessment was NIDDM with poor control, left hydrocele and hyperlipidemia. Dalton recommended obtaining a fasting blood sugar and lipid panel, a referral for the hydrocele continuation of the glucotrol XL regularly, and adherence to the 1,500 calorie ADA diet;

9

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

12.  A July 15, 2000 Gilmer Primary Care report from Fogle indicating an assessment of DM w/poor control and a history of GERD. Fogle recommended follow-up labs, glucophage, continuation of blood sugar readings and a return appointment in ten days.  Fogle noted that Bush declined the referral for a hydrocele;

13.  An August 1, 2000 Gilmer Primary Care report from A. R. Fogle, PA-C indicating that Bush's blood sugar readings had "improved remarkably".   Fogle recommended continuation of Glucotrol, daily blood sugar readings and a return appointment in one month;

14.  An August 31, 2000 report from Dr. David Anderson to the West Virginia Department of Education and the Arts, Division of Rehabilitation Services, indicating a diagnosis of diabetic neuropathy and advising against working because "any stress will increase sugar and worsen symptoms";

15. An August 31, 2000, Physical Functional Capacity Assessment from Hugh M. Brown, M.D., indicating Bush could occasionally lift and/or carry 50 pounds, could frequently lift and/or carry 25 pounds, could stand and/or walk about 6 hours in an 8-hour workday, could sit for a total of about 6 hours in an 8-hour workday, had unlimited ability to push and/or pull, had the ability

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

to frequently climb, balance, stoop, kneel, crouch or crawl and had no manipulative, visual, communicative or environmental limitations;

16.  A September 12, 2000 Gilmer Primary Care report from A.R. Fogle, PA-C indicating complaints of heart racing, abdominal cramping, pain and diarrhea. Fogle's assessment was Gastroenteritis and DM. Fogle recommended compazine, vioxx, pepcid, increase in fluids and a return appointment if any increase or change. Fogle noted that Bush declined a transfer to MHHCC for overnight observation and also noted a history of DM and ETOH abuse;

17.  A September 19, 2000 Gilmer Primary Care report from Dr. Dawlah indicating an assessment of DM with peripheral neuropathy, abdominal pain PUD vs. pancreatitis due to a history of alcoholism, and Tachycardia. Dr. Dawlah recommended obtaining a UA, CBC, BUN, creatinine, electrolytes, LFT and amylase, continuation of Neurontin, increasing Glucotrol XL, pepcid and a return in about a week;

18.  A September 26, 2000 Gilmer Primary Care report from A.R. Fogle indicating an assessment of DM, gastric upset with diarrhea secondary to his medication and insomina.  Fogle recommended an

increase in Neurontin and a prescription for Sonata. Fogle noted that Bush vehemently declined to have a barium enema and also declined to have a KUB flat and upright XR. Fogle noted continuing complaints of leg pain and diarrhea and prior non compliance with prescribed medications but "we have been working w/ him steadily & he has been taking his medications";

19. An October 5, 2000 report from Dr. Melinda Lucky of The Eye Clinic of Gilmer County Primary Care indicating that Bush reported a three year history of treatment for diabetes, checking his blood sugar twice a day and a fasting blood sugar that morning of 241. Examination revealed an OD: OJO Sphere of 20/20 and an OS: OJO Sphere 20/20-3. Dr. Lucky stated that the presence of one small blot hema indicated the presence of background diabetic retinopathy which did not warrant immediate treatment, only close monitoring;

20. An October 12, 2000 Gilmer Primary Care report from A.R. Fogle indicating an assessment of DM partially uncontrolled at this time and abdominal cramps. Fogle recommended stopping the oral glycemic agents, beginning Novel, continuing monitoring blood sugar readings, increasing Neurontin, scheduling an abdominal CT, return appointment on Monday with BS readings, and return if any increase or change;

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

21.  An October 16, 2000 Gilmer Primary Care report from Zubaer M. Dawlah, M.D., indicating an assessment of DM, peripheral neuropathy and diarrhea. Dr. Dawlah recommended an increase in Humulin, a prescription for Elavil, continuation of blood sugar readings and a CT scan of the abdomen and pelvis;

22.  An October 26, 2000 Gilmer Primary Care report from A.R. Fogle, PA-C indicating an assessment of IDDM and diarrhea that has decreased in frequency and amount. Fogle recommended a return appointment on Saturday morning for Hgb A1C and lipids, an increase in insulin, continue daily monitoring of blood sugar levels, continue  Neurontin, increase Elavil and a return appointment in two weeks. Fogle noted that Bush had been on oral medication for diabetes but was now IDDM and that, when he first saw him, he had been an uncontrolled diabetic but "now it is better than it was";

23.  An October 28, 2000 Gilmer Primary Care report from A.R. Fogle, PA-C, indicating an assessment of DM and a Hypoglycemic episode due to taking an insulin dose prior to coming for fasting labs.  Fogle instructed Bush to never take his insulin without having a meal immediately after and to continue bi-daily glucose readings;

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

24. A November 2, 2000 Gilmer Primary Care record from Zubaer M. Dawlah, M.D., indicating an assessment of DM with evening hyperglycemia and neuropathy in the feet. Dr. Dawlah recommended an increase in Humulin, a DT vaccination and a return appointment in three weeks. Dr. Dawlah noted that the pain in the foot is still present but that there may be a "slight improvement, but not much";

25. A November 28, 2000 Gilmer Primary Care report from A. R. Fogle indicating a follow-up for DM. Bush reported that his feet were still sore and that he was having problems with erections. Fogle noted that the BS readings Bush brought from home show very good levels and assessed IDDM and neuropathy to the lower extremities. Fogle recommended an increase in Elavil, Sonata to be used in the middle of the night, Humulin, labs at his next visit and a return appointment in one month unless there was an increase or a change;

26. A January 2, 2001 Gilmer Primary Care report from A.R. Fogle indicating a follow-up for DM. Fogle's assessment was IDDM and neuropathy. Fogle recommended fasting a.m. blood sugar testing, continuation of current medications, humulin, neurontin, elavil, and a return visit in one week unless there is a change. Fogle noted that Bush had lost his medical card and had not been checking

his blood sugar because he did not have any strips. Fogle gave him a sample glucometer and plenty of testing strips. Fogle further noted that Bush reported having a "difficult time w/ diabetic neuropathy in his feet, which are clean and show no apparent onycholycosis or erythema";

27. A January 11, 2001 Gilmer Primary Care report indicating a follow-up for insulin dependent diabetes mellitus and diabetic neuropathy. Fogle recommended Glucophage 500 mg to try to stabilize the blood sugar, continuation of current medications, continue insulin at current dosage, and return in one week with blood sugar logs if no change, increase or shortness of breath. Fogle noted that, after Bush reported some chest discomfort, they performed an EKG which was within normal limits;

28. A January 18, 2001 Gilmer Primary Care report from A.R. Fogle indicating complaints of feeling much more frail and increasing sugar levels. Fogle's assessment was IDDM and anxiety. He recommended an increase in insulin, increase in diet and fluids, continued record of insulin readings and if over 200 medication will be adjusted, and a follow-up in two weeks. Bush was given samples of Neurontin 400 mg. Fogle noted that Bush reported his

medical card was canceled and that he refused to apply for it any more;

29. A February 1, 2001 Gilmer Primary Care report from A. R. Fogle, PA-C, indicating complaints of continued pain in his feet, continuous gastic upset and some nausea. Fogle's assessment was diabetes mellitus, diabetic neuropathy and weight loss. He recommended continuation of insulin and blood sugar readings, increase in diet, continue neurotin 300 mg for one week then increase to two tablets, follow up with medical assistance program and return in one month if no change;

30. An April 3, 2001 Gilmer Primary Care report from A.R. Fogle, PA-C, indicating a chief complaint of "walking around about 2:00 p.m. and split [sic] out about 3-4 mouthfuls of blood. States he does not know where it came from and did not feel like it came from his throat." Fogle observed that Bush appeared to be lethargic, sometimes almost asleep. His assessment was vision change, hemoptysis, IDDM, nausea and lethargy and his recommendation was continue insulin, increase fluid intake, decrease nicotine dependency and return in one week if there is no increase or change. Fogle noted that Bush declined a transfer to

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

the ER and rectal and labs, a proton pump and a vision chart exam

and refused to sign an AMA statement;

31. A May 8, 2001 Gilmer Primary Care report from A.R. Fogle,

PA-C, indicating:

> Mr. Bush has been under our care since 7/8/00
> and is a current patient for his insulin
> dependent diabetes. In addition, Mr. Bush
> suffers from neuropathy, or nerve pain in his
> lower extremities with decreased feeling and
> function in his lower extremities. Mr. Bush is
> in constant pain from this and is being
> treated with numerous medications. Mr. Bush
> also has been seen by an Optometrist and
> diagnosed with Retinopathy or having problems
> in his eye, secondary to his diabetes. He has
> been diagnosed by way of a letter in his file
> with a small blot hemorrhage in his one eye.
> Additionally, Mr. Bush suffers from erectile
> dysfunction also secondary to his diabetes.
> Mr. Bush continues to complain of his cold and
> painful feet and the inability to walk due to
> the pain and numbness of his feet. He does
> exhibit marked neuropathy with inability to
> feel with monofilament touch in his lower
> extremities extending almost to the ankle. He
> also has decreased pedal pulses bilaterally in
> his feet.
>
> Mr. Bush has had problems obtaining his
> medications, due to not having insurance and
> not qualifying for unknown reasons for the
> medical card. Therefore, he has been
> noncompliant with his medication usage. We
> have been able to help Mr. Bush with his
> medications through a medication assistance
> program. Mr. Bush's current status has
> improved over the last year based on his HBG
> A1C results. His initial HBG A1C was at 12.0%

> which dropped to 6.4% as of September of this
> year. This is a marked improvement in the last
> year. This has been accomplished with
> increased medications and his own compliance.
> We feel he needs to maintain this state of
> treatment and increased compliance.

32. A September 11, 2001 Physical Functional Capacity
Assessment from Cynthia Osbourne, D.O., indicating Bush could
occasionally lift and/or carry, 20 pounds; could frequently lift
and/or carry, 10 pounds; could stand and/or walk, about 6 hours in
an 8-hour workday; could sit for a total of about 6 hours in an 8-
hour workday; had unlimited ability to push and/or pull, could
occasionally climb, balance, stoop, kneel, crouch, or crawl, should
not have concentrated exposure to extreme cold, vibration or
hazards and had no manipulative, visual or communicative
limitations;

33. A December 25, 2001 Stonewall Jackson Memorial Hospital
report indicating Bush went to the emergency room due to blood
sugar readings of more than 400. Bush was admitted and given IV
insulin, IV fluids and monitoring of glucose levels. The diagnosis
at discharge was diabetic ketoacidosis and diabetic peripheral
neuropathy. He was discharged with NPH 70/30 units every morning
and 25 units every evening and neurontin 400 mg four time a day and
directed to follow-up with his primary care physician;

18

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

34. A January 19, 2002 Minnie Hamilton Health Care office note indicating an assessment of MDDM and URI.

35. A January 29, 2002 Minnie Hamilton Health Care office note indicating an assessment of DM and Neuropathy;

36. A February 18, 2002 Minnie Hamilton Health Care report from A. R. Fogle, PA-C, indicating a complaint of a cut of unknown origin on the left great toe. After cleaning and dressing the wound, Fogle recommended a referral to a podiatrist, Dr. Anderson, normal saline cleansing with Avylen dressing, direction to keep foot elevated and dry, prescriptions for Neurotin, Glucophage and insulin and return appointment in one week;

37. A February 19, 2002 report from Dr. David Anderson, indicating a complaint of sore on his left big toe that has been there about a week. Dr. Anderson's assessment was a grade III ulceration of the left big toe. Dr. Anderson excised all necrotic non-viable tissue and flushed the wound with sterile scalpel and pick-up and instructed Bush not to do "any peeling on it" and to return for a follow-up appointment in one week;

38. A February 27, 2002 Minnie Hamilton Health Care report indicating an assessment of a diabetic ulcer left big toe;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

39.    An April 4 and 5, 2002 psychological evaluation from

Wilda Posey, M.A., Supervised Psychologist, and L. Andrew Steward,

Ph.D, Licensed Psychologist, of Cardinal Psychological Services,

indicating a diagnostic impression of Axis I Major Depressive

Disorder, without Psychotic Features, Moderate; Alcohol Dependence,

in early remission, Nicotine Dependence, pain disorder associated

with a medical condition with psychological Factors; Axis II

borderline intellectual functioning, traits of cluster A

personality disorder; Axis III reported back pain, diabetes

mellitus type II, hyperlipidemia, and erectile dysfunction; Axis IV

Financial Problems; and Axis V current GAF of 55. In their

conclusions and recommendations, the psychologists indicated:

> Mr. Bush is a 39-year old, white married male,
> referred for an assessment of psychological
> functioning to assist with his eligibility for
> Social Security disability. Intellectually he
> is currently functioning in the Borderline
> Range of Intellectual Functioning with a Full
> Scale IQ Score of 74. He has a Verbal IQ Score
> of 79 and a Performance IQ Score of 72,
> indicates that his Verbal and Performance IQ
> Scores are considered to be equally developed.
> There are no indications of organic brain
> dysfunction beyond what would be expected at
> his cognitive ability. Based upon his WAIS-III
> Scores, his judgment and comprehension are
> considered to be mildly deficient. Insight is
> considered to be poor. His concentration is
> considered to be mildly deficient.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Emotionally, he describing [sic] symptoms of irritability, sleeplessness, and loss of interest. Mr. Bush has been diagnosed by his treating physician as having anxiety problems and erectile dysfunction. He has also been diagnosed with diabetes mellitus with retinopathy, and peripherial neuropathy. He meets the diagnostic criteria for Major Depressive Disorder, Moderate, without Psychotic Features, Alcohol Dependence, in early sustained remission, and Nicotine Dependence. He also meets the criteria for Pain Disorder, associated with a General Medical Condition, with psychological Factors. Testing assessments do indicate that Mr. Bush is experiencing problems with dealing with his medical condition due to pain as well as problems in his marital and familial relations.

It is recommended that Mr. Bush continue with medical follow up and referral to a pain clinic for consultation. It is also recommended that Mr. Bush have a psychiatric evaluation for his depressive disorder and pain disorder. It is also recommended that he continue with AA and also have psychotherapy to help alleviate the problems with his depressive disorder and alcohol dependence. It is further recommended that he receive individual, family and marital counseling.

Significantly, the psychologists noted that:

During the evaluation process, Mr. Bush put forth inconsistent effort on all items. His attention was generally sustained, but he was not highly motivated to complete some of the assessment instruments. Although, the results of this evaluation are still considered to be a valid indicator of his overall cognitive and emotional functioning.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

40. An April 4 and 5, 2002 mental residual functional capacity assessment from Wilda Posey, M.A. and L. W. Steward, Ph.D, indicating no significant limitation in ability to 1) remember locations and work-like procedures, 2) understand and remember very short and simple instructions, 3) understand and remember detailed instructions, 4) carry out very short and simple instructions, 5) sustain an ordinary routine without specific supervision, 6) make simple work-related decisions, 7) interact appropriately with the general public, 8) ask simple questions or request assistance, 9) accept instructions and respond appropriately to criticism from supervisors, 10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, 11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, 12) respond appropriately to changes in the worksetting and 13) travel in unfamiliar places or use public transportation.  Bush had moderate limitation in ability to 1) carry out detailed instructions, 2) maintain attention and concentration for extended periods, 3) perform activities within a schedule, 4) maintain regular attendance and be punctual within customary limits, 5) work in coordination with or proximity to others without being distracted by them, 6) be aware of normal

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

hazards and take appropriate precautions, and 7) set realistic goals or make plans independently of others.

42. An April 4, 2002 Psychiatric Review Technique from Wilda Posey, M.A. and L. W. Steward, Ph.D, indicating an affective disorder involving depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feeling of guilt or worthlessness, and difficulty concentrating or thinking.

Bush's functional limitations were moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning and mild restriction in difficulties in maintaining concentration, persistence or pace.

43. An April 6, 2002 Residual Functional Capacity Assessment Mental from Rick A. Fogle, PA-C, indicating that the impairments and symptoms alleged were consistent with clinical records and observations, a diagnosis of insulin dependent diabetes, diabetic neuropathy/nerve pain in the lower extremities, decreased feeling and function in lower extremities, anxiety, sinus tachycardia, insomnia, and anxiety. Fogle also indicated that Bush could not perform any full-time work but was capable of part-time sedentary

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

work for a maximum of four hours a day that involved no walking or lifting. Bush could stand or walk for ten minutes at one time, had to alternate positions frequently, no climbing, balancing, stooping, bending, kneeling, crouching, crawling, stretching, reaching or squatting, restricted exposure to machinery, jarring or vibrations, excessive humidity, cold or hot temperatures, fumes, dust, noise and environmental hazards, could not use his feet for repetitive motions such as pushing or pulling leg feet controls and could not use his hands for repetitive actions, grasping, arm controls or fine manipulation.

Fogle based his diagnosis and RFC on an increased HgBAIC reading and a decreased finding on a monoficiant test to leg and foot; and

44. A May 30, 2002 report from Dr. David Anderson indicating Bush's left big toe had healed but he now had an ingrown lateral left 4th with pain, edema, erythema, granuloma, exudate, localized cellulitis but no lymphangitis. Dr. Anderson performed a PNA and excised and flushed all necrotic non-viable tissue from the wound. He discussed proper diabetic foot care and shoe gear with Bush and gave him written instructions as well. Dr. Anderson recommended a follow-up appointment in two weeks.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### VI. DISCUSSION

A.

Bush objects to the report and recommendation contending that the ALJ failed to properly consider the opinions of his treating physicians, specifically Dr. Dawlah, Rick Fogle, PA-C, Dr. Proctor and Dr. Anderson and failed to provide an adequate basis for the weight assigned to their opinions. The Commissioner asserts that the ALJ properly evaluated the medical opinions of record and properly declined to assign controlling weight to the treating physicians' opinions.

In Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984), the Fourth Circuit held that the opinion of a treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. § 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

laboratory diagnostic techniques and
is not inconsistent with the other
substantial evidence in [the] case
record, we will give it controlling
weight.

[4,5] By negative implication, if a
physician's opinion is not supported by
clinical evidence or if it is inconsistent
with other substantial evidence, it should be
accorded significantly less weight.

To determine if an impairment is adequately supported by medical
evidence, the Social Security Act requires that impairment,
physical or mental, to be demonstrated by medically acceptable
clinical or laboratory diagnostic techniques. 42 U.S.C.
§ 423(d)(1), (3); Heckler v. Campbell, 461 U.S. 458, 461 (1983); 20
C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human
Servs., 932 F.2d 295, 297 n.1. (4th Cir. 1990).

In Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the
Fourth Circuit stated that the ALJ bears the ultimate
responsibility for weighing the evidence and resolving any
conflicts, and that, in reviewing for substantial evidence, the
reviewing court does not re-weigh conflicting evidence, make
credibility determinations, or substitute its judgment for that of
the Commissioner. Moreover, the scope of the Court's review is
limited to determining whether there is substantial evidence in the

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

record to support the findings of the Commissioner and whether the correct law was applied. The Court is not to substitute its judgment for that of the Commissioner. Id.

Bush points to the factors set forth in § 404.1527(d)(2) and alleges that the ALJ failed to address these factors prior to refusing to assign controlling weight to the reports of his treating physicians. 20 C.F.R. § 404.1527(d) provides:

> (d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
>> (1)    *Examining    relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2)    *Treatment    relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture   of   your   medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from    reports    of    individual examinations, such as consultative examinations    or    brief

27

hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source

has about your impairment(s) the
more weight we will give to the
source's medical opinion. We will
look at the treatment the source has
provided and at the kinds and extent
of examinations and testing the
source has performed or ordered from
specialists and independent
laboratories.

(3) *Supportability*. The more a medical source
presents relevant evidence to support an
opinion particularly medical signs and
laboratory findings, the more weight we will
give that opinion. . . .

(4) *Consistency*. Generally, the more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

Bush correctly asserts that an ALJ is required to consider all
of these factors; however, he fails to cite any Fourth Circuit case
law indicating that an ALJ must specifically discuss each of the
criteria contained in § 404.1527(d) in his opinion. Here, even
though the ALJ did not explicitly reference each of the factors
enumerated in § 404.1527(d) regarding the opinions of Drs. Proctor,
Anderson and Dawlah and PA-C Fogle, he discussed some of the
relevant factors in narrative form and summarized almost the entire
medical record before him prior to determining that the evidence in
the record did not support assigning great weight to the opinions
of Dr. Dawlah, Rick Fogle, PA-C, Dr. Anderson and Dr. Proctor.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

After considering the evidence of record, including Dr. Dawlah's records, the ALJ assigned some, but not controlling, weight to Dr. Dawlah's April 16, 2002 opinion indicating that Bush had the residual functional capacity to perform part-time sedentary work that did not require walking or lifting or the ability to perform repetitive actions, such as simple grasping with arms or fine manipulations of the hands. The ALJ also determined that Dr. Dawlah's opinion that Bush could perform only very limited part-time work was inconsistent with his prior opinion recommending vocational rehabilitation.

With respect to Dr. Anderson, the ALJ noted that in August 2000, Dr. Anderson indicated "that he would not advise the claimant to work because any stress would increase sugar and worsen symptoms." On February 19, 2002, Dr. Anderson indicated that the sore on the left great toe was completely healed and that, at this time, he debrided a wound on the left 4th toe and instructed Bush orally and in writing regarding the importance of maintaining his visits, wearing the proper footwear and proper diabetic foot care. Significantly, the record does not contain any reports from Dr. Anderson indicating any other appointments or treatment.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Dr. Proctor treated Bush from October 1, 1993 through January 4, 2000. Dr. Proctor opined that "the only debilitating factor was the claimant's [Bush] diabetic neuropathy of the feet" and indicated that Bush could only work part-time.

PA-C Fogle noted that Bush had been a patient beginning in July 2000 and further noted that, when Bush was compliant with his medication, his diabetes mellitus was "better controlled." In a residual functional capacity assessment, Fogle indicated that Bush could not perform any full-time work but was capable of part-time sedentary work for a maximum of four hours a day if it involved no walking or lifting.

Social Security Ruling (SSR) 96-5p at *3 provides:

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

Here, after considering all of the evidence in the record the ALJ determined:

> The claimant's treating and examining physicians have stated the claimant cannot work or can only work part-time. This is an opinion on an issue that exceeds the expertise of the physician and is reserved to the Commissioner of Social Security under the law and Social Security Rule 96-5. Thus, a

31

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> treating or examining physician's opinion, while part of the record and must be considered is not entitled to controlling weight or special significance. Nevertheless, the limitation to part-time work is not well supported in the clinical findings and seems inconsistent with Dr. Dawlah's reference to the need for vocational rehabilitation, with which the undersigned substantially agrees in a sense: the claimant can no longer be a construction worker bu he can still do other, less physically demanding work.

The Magistrate Judge determined that the record contained substantial evidence to support the ALJ's decision not to assign controlling weight to the opinions of Dr. Dawlah, Dr. Anderson, Dr. Proctor and PA-C Fogle and that the ALJ's opinion sufficiently outlined the basis for his decision.  The Court agrees.

B.

Bush contends that the ALJ failed to analyze his condition pursuant to Diabetes listing 9.09.  The Commissioner contends that this argument was not made in his initial brief and is incorrect.

20 C.F.R. § 404.1525(a) provides:

> (a) *Purpose of the Listing of Impairments.* The listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. Most of the listed impairments are permanent or expected to result in death, or a specific statement of duration is made.  For all others, the evidence must show that the

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

---

impairment has lasted or is expected to last
for a continuous period of at least 12 months

The listing for diabetes mellitus is found in 20 C.F.R. Pt. 404,

Subpt. P. App. 1.  At Listing 9.08 and provides:

9.08 *Diabetes Mellitus*. With:

A.     Neuropathy demonstrated by significant
       and persistent disorganization of motor
       function in two extremities resulting in
       sustained    disturbance    of    gross   and
       dexterous movements, or gait and station
       (see 11.00C); or

B.     Acidosis   occurring   at   least   on   the
       average of once every 2 months documented
       by appropriate blood chemical tests (pH
       or $PCO_2$ or bicarbonate levels) or

C.     Retinitis    proliferans;    evaluate    the
       visual impairment under the criteria in
       2.02, 2.03, or 2.04.

Listing 11.00C provides:

C.   Persistent   disorganization   of   motor
function in the form of paresis or paralysis,
tremor or other involuntary movements, atxia
and sensory disturbances (any and all of which
may be due to cerebral, cerebellar, brain
stem,   spinal   cord,   or   peripheral   nerve
dysfunction) which occur singly or in various
combinations frequently provides the sole or
partial   basis   for   decision   in   cases   of
neurological   impairment.   The   assessment   of
impairment    depends    on    the    degree    of
interference    with    locomotion    and/or
interference with the use of fingers, hands,
and arms.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Listings 2.02, 2.03 and 2.04 provide:

> 2.02 *Impairment of visual acuity.* Remaining vision in the better eye after best correction is 20/200 or less;

> 2.03 *Contraction of peripheral visual field in the better eye.*

>> A.   To 10° or less from the point of fixation; or

>> B.   So the widest diameter subtends an angle no greater than 20°; or

>> C.   to 20 percent or less visual field efficiency.

> 2.04 *Loss of visual efficiency.* The visual efficiency of the better eye after best correction is 20 percent or less. (The percent of remaining visual efficiency is equal to the product of the percent of remaining visual acuity efficiency and the percent of remaining visual field efficiency.)

Here, the ALJ determined:

> The medical evidence shows that even though the claimant has diabetes mellitus, lower extremity neuropathy and an ulceration of his left great toe, he has no evidence of significant disorganization of motor function, sustained disturbance of movements, amputation due to diabetic necrosis or acidosis on average of every two months. He doe shave some mild background retinopathy that has only minimally affected his vision.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Thus, even though the ALJ did not specifically reference Listing 9.08, the ALJ did refer to the elements contained in Listing 9.08 prior to determining that the evidence of record did not contain any documentation that met or equaled any of the listing's requirements. Furthermore, the ALJ determined that, even though, when considered in combination, Bush's diabetes, foot neuropathy, diabetic ulcer of the right toe, retinopathy and depression were severe, they did not meet or medically equal a listed impairments in Appendix 1, Subpart P, Regulation No. 4.

Therefore, the Magistrate Judge determined that, even though the ALJ did not specifically refer to Listing 9.08, he did carefully consider the evidence of record prior to determining that Bush's impairments, even in combination, did not satisfy or equal a listed impairment. The Court agrees.

### C.

Bush objects to the report and recommendation contending that the ALJ failed to contact his treating physician for clarification or additional information. The Commissioner contends that the ALJ properly evaluated Dr. Dawlah's opinion and, therefore, was not required to recontact him.

20 C.F.R. § 404.1512(e) provides in pertinent part:

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

(e) Recontacting medical sources.  When the evidence we receive from your treating physician or psychologist or other medical source is <u>inadequate</u> for us to determine whether you are disabled, we need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available.  We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. . . . [Emphasis added.]

SSR 96-5p provides in relevant part:

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Bush contends that because the ALJ stated he "was in doubt as to the basis for Dr. Dawlah's opinion regarding a limitation to part-time work in view of the need for vocational rehabilitation" he was obligated to recontact Dr. Dawlah to seek clarification.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

However, 20 C.F.R. § 404.1512(e) only requires the ALJ to recontact a treating physician when "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled."

Here, the ALJ determined that the limitation to part-time work was not well supported by the clinical findings and seemed inconsistent, not inadequate, with Dr. Dawlah's reference to the need for vocational rehabilitation. See Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995) (an ALJ may reject the opinion of the treating physician when it is internally inconsistent). Moreover, the extensive medical records in this case clearly provide a substantial basis for the ALJ's determination that Bush is not disabled.

The Magistrate Judge determined that, because the ALJ had sufficient evidence on which to make a disability determination, he was not required to recontact Dr. Dawlah for clarification. The Court agrees.

D.

Bush contends that the ALJ failed to retain the services of an IME for purposes of the hearing.

20 C.F.R. § 404.1519(a)(b) provides:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

A consultative examination is a physical or mental examination or test purchased for you at our request and expense from a treating source or another medical source, including a pediatrician when appropriate. The decision to purchase a consultative examination will be made on an individual case basis in accordance with the provisions of §§404.1519a through 404.1519f.

§404.1519a  When  we  will  purchase  a consultative examination and how we will use it.

(a)(1) General. The decision to purchase a consultative examination for you will be made after we have given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnosis, and prognosis) is readily available from  the  records  of  your  medical sources.  .  .  .  Before  purchasing  a consultative examination, we will consider not only existing medical reports, but also the disability interview form containing your allegations  as  well  as  other  pertinent evidence in your file.

(b)  Situations  requiring  a  consultative examination. <u>A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim</u>.

[Emphasis added.]

After examining and evaluating all of the evidence of record, the ALJ determined that there was no need to obtain additional opinions or clarifications of existing opinions. The Magistrate

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Judge determined that there was substantial evidence in the record to support the ALJ's finding that Bush was not disabled. The Court agrees.

E.

Bush objects to the report and recommendation, alleging that the ALJ's finding that Bush was not "totally credible" failed to give any weight or credit to the psychological evaluation of Cardinal Psychological Services. Bush contends that the ALJ should have adopted the functional assessment of psychological evaluators, Dr. Steward and Ms. Posey. The Commissioner contends that the ALJ's mental RFC is supported by the record.

Bush asserts that the ALJ failed to follow the mandates of 20 C.F.R. § 404.1527(d) when weighing the report of Dr. Steward and Ms. Posey. As previously noted, the five factors to be considered under 20 C.F.R. § 404.1527(d) are: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.

The ALJ noted that Dr. Steward and Ms. Posey were not treating physicians and had examined Bush on a referral from his attorney.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

The ALJ declined to accept their assessment in its entirety because it indicated that Bush put forth an inconsistent effort on all items and that Dr. Steward and Ms. Posey deemed the results of the Personality Assessment Inventory invalid. Significantly, the ALJ noted that the results of this examination were based largely upon Bush's subjective complaints.[1]

Bush also contends that the ALJ erred in determining his credibility. In Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976), the Fourth Circuit found that "because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." In Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997), the Seventh Circuit held that "[B]ecause hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."

---

[1] Bush cites Stanley v. Barnhart, 116 Fed. Appx. 427 (4th Cir. 2004), where the Court held that the ALJ could discount a report because it was basely solely upon subjective statements. But see Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996)(noting a doctor's notation of a claimant's complaints of pain did not transform a subjective complaint into objective evidence).

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

In <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit established a two-prong analysis to use in determining a claim of disability due to pain. In <u>Craig</u>, the Fourth Circuit held that

> . . . the determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing
>
>> the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptom alleged.*
>
> 20 C.F.R. §§416.929(b) & 404.1529(b) (emphasis added): cf. 42 U.S.C. § 423(d)(5)(A) ('There must be medical signs and findings . . . which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain or other symptoms alleged . . . .') It is significant that the current regulations, like the statute upon which they were based, *see* 42 U.S.C. § 423(d)(5)(A), and paralleling the regulations which that statute purported to codify, *see* 20 C.F.R. §§ 416,929, 404.1529 (1983), were drafted using the definite article 'the' and the adjective 'alleged.' Therefore, for pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective medical evidence of the existence of a medical

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

impairment 'which could reasonably be expected to produce' the actual pain, in the amount and degree alleged by the claimant.

. . . At this stage of the inquiry, the pain claimed is not directly at issue; the focus is instead on establishing a determinable underlying impairment - a statutory requirement for entitlement to benefits, *see* 42 U.S.C. §1382c(a)(3)(A) - which could reasonably be expected to be the cause of the disabling pain asserted by the claimant.

Craig at 594.

In this case, the ALJ correctly applied the Craig test. The ALJ satisfied the first prong of Craig in finding that Bush "has presented medical evidence showing that he has impairments that could reasonably be expected to produce some pain and other subjective limitations." Specifically, the ALJ found that Bush had diabetes, feet neuropathy, diabetic ulcer, retinopathy and depression.

Following the second prong of Craig, the ALJ first considered Bush's complaints of debilitating symptoms in light of the entire record and determined that the objective evidence in the record did not support the alleged severity of Bush's complaints. The ALJ noted that neither "the objective medical evidence nor the testimony of the claimant establishes that the ability to function

has been so severely impaired as to preclude all types of work activities."

Next, the ALJ pointed to Bush's daily activities, finding that they undermined his complaints of debilitating limitations. The ALJ noted that Bush retained the ability to maintain his personal hygiene, prepare his own meals, read, visit and socialize daily with his friend, slowly walk the 1,000 yards to his friend's house, watch television, sit for extended periods of time, attend AA meetings, maintain a record of his blood sugar readings and attempt to exercise.

The ALJ also noted that, when Bush was compliant with his medication, abstained from drinking and followed a diabetic diet, his diabetes was better controlled. The ALJ also pointed out that, even though Bush testified that he last drank alcohol in January, 2002, the medical records demonstrated that he continued to drink thereafter. Bush also failed to comply with his treatment, declined tests recommended by his doctors and did not put forth his best efforts during his psychological evaluation.

Thus, it is clear that the ALJ carefully considered all the evidence in accordance with the second prong of Craig, prior to determining that Bush was not totally credible.  The Magistrate

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Judge determined that the ALJ was in the best position to assess Bush's credibility and was correct in his assessment of Bush's credibility and was correct in the weight assigned to the psychological evaluation of Cardinal Psychological Services. The Court agrees.

F.

Bush contends that the ALJ failed to follow SSR 96-7p in the analysis of Bush's pain and credibility.

SSR 96-7p provides:

> PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:
>
> > 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that

could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Here, the ALJ stated:

The claimant has presented medical evidence showing that he has impairments that could reasonably be expected to produce some pain and other subjective limitations. However, the Administrative Law Judge does not find entirely credible every allegation of subjective symptoms. In this case, the objective medical evidence and other evidence does not support the claimant's allegations of debilitating pain. The undersigned recognizes that the claimant may experience some degree of pain and discomfort with some activities. However, mild to moderate pain or discomfort is not, in and of itself, incompatible with the performance of sustained work activities. While the claimant has a fairly good work record over the years, neither the objective medical evidence nor the testimony of the claimant establishes that the ability to function has been so severely impaired as to preclude all types of work activities. As noted above, the claimant is capable of sitting for extended periods as evidence by his frequent visits to his fiend's house. He

46

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

is able to walk the 1000 yards to this same
friend's house, though very slowly, according
to the claimant. He is able to keep a daily
record of his sugar readings and, when
compliant with medication and diet and not
drinking, his diabetes is under better
control. He does take medication fo his foot
and ankle pain but there are no serious side
effects of medications noted in the records.
He was interested in minimizing his drinking
at the hearing, and he failed to give his best
efforts at the psychological evaluation set up
by his attorney; these suggest a likely
pattern of embellishing symptoms which would
lead to an award of benefits and minimizing
those which might preclude an award.

A review of the documented evidence, as
previously set forth, not to mention the
claimant's and his friend's testimonies, has
convinced the undersigned that the claimant's
statements concerning his subjective
limitations and their impact on his capacity
for physical and mental activities are in
excess of those that would reasonably be
expected from the objective clinical findings.
The Administrative Law Judge has concluded
that the claimant is credible only to the
extent of the established residual functional
capacity, as described below (SSR-96-7p).

Thus, it is clear that the ALJ did follow the mandates set

forth in SSR 96-7p prior to determining that Bush's subjective

complaints were not totally credible.

The Magistrate Judge determined that the record contains

substantial evidence to support the ALJ's credibility

determination. The Court agrees.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

G.

Bush contends that the ALJ failed to identify the substantial evidence in the record supporting his findings. As noted above, in Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.

Here, the ALJ carefully and correctly evaluated all of the evidence of record prior to assigning weight to the opinions of the treating and examining physicians and examining psychologists, prior to determining that Bush's impairments did not meet or equal a listing, prior to determining Bush's credibility, prior to determining that a consultative exam was not required, prior to determining that it was not necessary to recontact Dr. Dawlah for clarification, and prior to making the ultimate determination that Bush was not disabled. Moreover, as noted above, the Magistrate Judge determined that the record contained substantial evidence to support the ALJ's findings. The Court agrees.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

### VII. <u>CONCLUSION</u>

Upon examination of Bush's objections, it appears that he has not raised any issues that were not thoroughly considered by the Magistrate Judge in his report and recommendation. Moreover, upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances in this action. Therefore, it

**ORDERS** that Magistrate Kaull's Report and Recommendation be, and it is, accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate. Accordingly,

1. the defendant's motion for Summary Judgment (Docket No. 11) is **GRANTED**;

2. the plaintiff's motion for Summary Judgment (Docket No. 9) is **DENIED**; and

3. this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

The Clerk of the Court is directed to transmit copies of this

Order to counsel of record.

DATED: March 21, 2006.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE
